UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CHRISTIAN WALKER,

    Petitioner,

vs.

BRIAN WILLIAMS, et al.,

    Respondents.

Case No. 2:08-CV-01551-PMP-(GWF)

**ORDER**

Before the court are the first amended petition for writ of habeas corpus (#23), respondents' answer (#58), and petitioner's reply (#63). The court finds that petitioner is not entitled to relief, and the court denies the petition.

On October 3, 1997, Maureen McConaha, age 17, was killed in a patch of desert that lies between a freeway and houses. She had been shot with a .25-caliber pistol. Her left hand was wounded, and she had four wounds in her head.

Sarah Hendricks had been babysitting for relatives near where McConaha's body had been found. When she left before 11:00 p.m., she noticed to her left, the west, three young people. She could not see faces, but one person appeared to be female, wearing a horizontal-striped shirt, based upon the person's stance, and a second person appeared to be male. McConaha was found wearing a horizontal-striped shirt.

Rosco Workman was the father of the child being babysat. He left the house shortly after Hendricks to take a son to visit a friend. Outside, before entering his car, he heard three gunshots, one, and then two in quick succession.

Petitioner, who was McConaha's boyfriend, and his cousin Johnny Walker were charged with McConaha's murder. Petitioner also was charged with violating a temporary protective order that required him have no contact with McConaha. The trial of the co-defendants was severed because Johnny Walker made statements that incriminated both himself and petitioner. Ex. 11, pp. 31-33 (#24).

The prosecution presented the testimony of Tobin Roche and Dana Eichar. They held a party at their house on the night of October 3 and the early morning of October 4. They testified that petitioner, McConaha, and Johnny Walker arrived before 9:30 p.m. and left around 10:50 p.m. Around 12:30 a.m. petitioner and Johnny Walker returned with a number of people unknown to Roche and Eichar. Petitioner tried to gain them entry to the party, and Roche refused. McConaha was not with petitioner and Johnny Walker this time.

Petitioner presented an alibi that is divided into two parts. First, Nearie Howes, her husband Glen Howes,[1] her brother Kyan Andersen, and Sonny DeCastro testified that a group of people was congregating on a street corner when the police responded to a call around 10:00 p.m. They testified that an officer checked each person for warrants and sent him or her away individually.[2] The people went to the nearby house of Nearie Howes and Kyan Andersen and waited for the whole group to arrive. Petitioner and Johnny Walker arrived at the house some time between 10:00 p.m. and 10:45 p.m., depending upon the witness. Some time between 10:30 p.m. and 11:10 p.m. the group of people, including petitioner and Johnny Walker, went to the home of someone named Chance, where rumor said that a party was occurring. Not finding a party there, petitioner led the group to Roche's and Eichar's party, around 11:30 p.m. Failing to gain entrance, the group split up, because some people wanted to go to the house of John Palumbo. Those people testified that they arrived at Palumbo's house around 12:00 midnight. They saw petitioner and Johnny Walker drive

---

[1]They married after McConaha's death and before the trial.

[2]The officer testified that he did not remember how the call ended, but that usually he did not send people away individually because they might then attack him while he was focusing on the remaining people. Ex. 64, p. 77 (#31).

away to the west.  In the second part of the alibi, Jennifer Benedict testified that she saw petitioner at the Gameworks arcade between 11:45 p.m. and 12:00 midnight.

With the exception of the Gameworks arcade, all the relevant locations are close to each other, within a mile.  The Gameworks arcade is several miles to the west of the other locations.

The preceding is intended as a short summary for any reader not familiar with the case. Much more evidence was presented at trial, but petitioner has never challenged the sufficiency of the evidence used to convict him.

The jury found petitioner guilty of second-degree murder with the use of a deadly-weapon and of the violation of the temporary protective order.[3]  Ex. 71, 72 (#32).  The trial court sentenced petitioner to life imprisonment with the possibility of parole after ten years for second-degree murder, an equal and consecutive term for the use of a deadly weapon, and a concurrent year in jail for violation of the temporary protective order.  These sentences run consecutively to the sentence that petitioner is serving for the attempted murder of David Dimas with the use of a deadly weapon.[4]  Ex. 83 (#32).  Petitioner appealed, and the Nevada Supreme Court affirmed.  Ex. 89 (#33).

Petitioner then filed pro se in state court a habeas corpus petition and supporting memorandum.  Ex. 91, 92 (#32).  Counsel later represented petitioner, and counsel filed, among other documents, a supplemental brief and amended supplemental brief.  Ex. 110 (#34), 121 (#35). The court denied the petition.  Ex. 123 (#36).  Petitioner appealed, and the Nevada Supreme Court affirmed.  Ex. 140 (#37).

Petitioner then commenced this action.  The court appointed counsel, who filed the first amended petition (#22).  The first amended petition contained eight grounds.  The court dismissed ground 7 because it was a claim of error in the state post-conviction proceedings, and such claims are not addressable in federal habeas corpus.  Order, p. 1 (#38).  Reasonable jurists would not find

---

[3]None of the grounds in the first amended petition (#22) challenge the validity of the conviction for violating the protective order.

[4]As discussed below, the facts of the Dimas case were admitted into evidence in this case.

this determination to be debatable or wrong, and the court will not issue a certificate of appealability on this ground.

Respondents then filed a motion to dismiss (#43). The court found that grounds 4(f) and 5 were not exhausted. Order (#46). Ground 4(f) was a claim that trial counsel was ineffective for failing to object to jury instruction 23. In the state-court proceedings, petitioner had argued that instruction 23 was erroneous, and petitioner had argued that trial counsel failed to object to instructions 25 and 31, but petitioner never claimed in state court that trial counsel failed to object to instruction 23. Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability on ground 4(f).

Ground 5 was a claim that appellate counsel was ineffective for not raising issues on direct appeal as issues of federal law. In the first state habeas corpus proceedings, petitioner raised this issue in the petition, but he did not raise the issue on appeal. In petitioner's second, successive state habeas corpus proceedings, petitioner raised a claim of ineffective assistance of appellate counsel, but for a reasons other than failing to raise issues on direct appeal as a matter of federal law. Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability on ground 5.

Petitioner elected to dismiss the unexhausted grounds, and the dismissal of ground 5 caused the dismissal of grounds 1 and 6. The court found that the federal-law claim in ground 1 was procedurally defaulted because petitioner could have raised the claim on direct appeal but did not. Order, p. 5 (#46). The court found that ground 6 was procedurally defaulted because petitioner raised the claim in a petition that was dismissed as untimely, successive, abusive of the writ, and barred by laches. Id., p. 6 (#46). Petitioner's argument for cause and prejudice to excuse the procedural default was that appellate counsel provided ineffective assistance by not raising the issues on appeal as issues of federal law. The court rejected that argument because it was the same as the unexhausted ground 5, and an unexhausted ground cannot be cause to excuse a procedural default. Id., pp. 5-6 (#46). Petitioner elected to dismiss ground 5, and the court necessarily dismissed ground 6 and the federal-law claim in ground 1 as procedurally defaulted. Order, p. 1 (#56). The remaining part of ground 1 was a claim of error in state law, on which the court cannot

grant relief pursuant to 28 U.S.C. § 2254(a), and the court dismissed it, too. Id. (#56). Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability on grounds 1 and 6.

Congress has limited the circumstances in which a federal court can grant relief to a petitioner who is in custody pursuant to a judgment of conviction of a state court.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Harrington, 131 S. Ct. at 785. "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Id. (citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citation omitted).

> [E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

> Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

-5-

Harrington, 131 S. Ct. at 786.

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id., at 786-87.

In ground 2, petitioner claims that his constitutional rights were violated when the jury viewed evidence that the trial court had ruled was inadmissible, and that the trial court erred when it denied his motion for a new trial. The trial court had ruled that evidence of petitioner's uncharged graffiti activities could be admitted. That evidence included two sealed bags that were seized as part of the investigation. Written on the bags were abbreviations and acronyms of other uncharged crimes, including possession of a controlled substance, possession of an unregistered firearm, and possession of narcotics paraphernalia. The trial court had ruled that evidence of those uncharged crimes could not be admitted. Those notations should have been redacted, but they were not. Inside one of the bags was a loaded magazine for a Glock 9mm pistol. See Ex. 153, 154 (#37). The bags should have remained sealed during jury deliberations, but the jury asked for permission to open them, and permission was given inadvertently.

After the verdicts were announced, petitioner moved for a new trial. Ex. 74 (#32). The trial court denied the motion. Ex. 77 (#32). On direct appeal, the Nevada Supreme Court held:

> Appellant next contends that he was prejudiced when certain pieces of excluded evidence were inadvertently given to the jury along with admitted evidence; this evidence also contained police acronyms (listing the contemplated charges) which were to have been redacted prior to submission the jury but were not. Appellant maintains that he was thereby exposed to the prejudicial impact of being branded a drug dealer (via the police acronyms on the evidence bags), and that he was prejudiced by the jury considering evidence which had been expressly disallowed by the district court. Appellant relies primarily on Winiarz v. State, wherein this court stated that "[t]he potential for substantial prejudice exists when a jury is permitted to consider evidence not admitted at trial." Appellant argues that, pursuant to Winiarz, a new trial must be granted in this case because it does not appear, beyond a reasonable doubt, that no prejudice has resulted.
>
> Winiarz also provides that the "determination of whether reversible prejudice has resulted from the jurors' consideration of inadmissible evidence in a given case 'is a fact question to be determined by the trial court'" and will only be reversed upon a showing of abuse of discretion. This court considers three factors in deciding whether to reverse: "'whether the issue of guilt or innocence is close, the quantity and character of the error, and the gravity of the crime charged.'"

> Notwithstanding the considerable gravity of the crime charged, we conclude that—given the overwhelming evidence of guilt and the relative insignificance of the error—the district court did not abuse its discretion in denying the motion for a mistrial. We conclude that the jury's exposure to the police acronyms and excluded evidence is relatively insignificant when compared with the inadmissible evidence the jury was exposed to in Winiarz. There, the jury in the defendant's second trial was inadvertently allowed to see the court clerk's notes from the original trial, which notes contained the original verdict and sentence. The Winiarz court concluded that the error was highly prejudicial because a "wavering jury could look to this document for reassurance that another group of twelve jurors . . . arrived at the stated conclusion." Here, on the other hand, the jury was exposed to practically undecipherable acronyms and several minor pieces of evidence. Further, the overwhelming evidence of guilt leads us to conclude that, "beyond a reasonable doubt, . . . no prejudice has resulted."

Ex. 89, pp. 3-4 (#33) (footnotes omitted).

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

Turner v. Louisiana, 379 U.S. 466, 472-73 (1965). Confrontation-Clause claims are subject to harmless-error analysis. United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004). In determining on federal habeas corpus whether an error is harmless, this court does not determine pursuant to 28 U.S.C. § 2254(d)(1) whether the Nevada Supreme Court applied Chapman reasonably. Instead, this court uses a more forgiving standard of harmless-error review. Fry v. Pliler, 551 U.S. 112, 119-20 (2007); Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010). In federal habeas corpus, an error is harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 631, 638 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637.

In this case, the error was harmless. Notes on an evidence bag would not reveal to the jury that petitioner used illegal narcotics, because the jury already knew. Many witnesses, both for the prosecution and for the defense, testified that they saw petitioner use drugs with McConaha and other people, that petitioner admitted using drugs, and that petitioner dropped a bag filled with marijuana on the night in question. Assuming that the jury deciphered the abbreviations, the notes

did not have a substantial and injurious effect on the verdict. Likewise, the jury's viewing of the loaded pistol magazine was harmless error. The jury already knew that petitioner was a violent person who was familiar with firearms. The jury heard the testimony of the fight between petitioner and McConaha that led to McConaha seeking a protective order against petitioner. The jury heard of petitioner's threats to McConaha should she continue to seek a protective order. The jury heard David Dimas testify that Johnny Walker shot him with a revolver, apparently .22-caliber, while petitioner was standing by them both. Given that evidence, the viewing of an pistol magazine unrelated either to the shooting of Dimas the death of McConaha could not have had a substantial and injurious effects upon the jury's verdict.

Reasonable jurists might disagree over the court's conclusion, and the court will grant a certificate of appealability on ground 2.

Ground 3 has two parts. In ground 3(a), petitioner claims that the prosecutors improperly elicited testimony that petitioner was in jail. On this issue, the Nevada Supreme Court held:

> Next, appellant contends that the State's repeated eliciting of testimony regarding appellant's in-custody status substantially prejudiced him and warrants reversal of his conviction. However, this argument is belied by the record. First, the State neither sought after testimony of this sort, nor did it repeatedly. Rather, on two occasions witnesses made unexpected references to jail and on three occasions witnesses made vague comments about being unable to see or call appellant. The first two instances—where the word "jail" was actually mentioned—were clearly volunteered by the witnesses, were not sought after by the State, and only indicated that appellant may have been in jail previously, not necessarily that he was still in jail at the time of trial. The other three instances were too vague to lend themselves to a clear inference that appellant was in custody. We conclude that the references failed to have the prejudicial impact spoken of in Haywood v. State. Haywood held that "[i]nforming the jury that a defendant is in jail raises an inference of guilt, and could have the same prejudicial effect as bringing a shackled defendant into the courtroom." Here, no such inference of guilt was made.

Ex. 89, p. 4 (#33) (footnotes omitted). "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation omitted). See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Review of the record shows the reasonableness of the Nevada Supreme Court's decision. The two instances in which a prosecution witness mentioned the jail were volunteered by the witnesses without any prompting by the prosecution. Ex. 60, p. 142 (#29) (Detective John Mikolainis), Ex. 61, pp. 89-90 (#29) (Josh Martinez). As for the defense

witnesses, Sonny DeCastro testified that he could not call petitioner. Ex. 64, p. 175 (#31). Kyan Andersen testified that he had visited petitioner one time. Ex. 64, pp. 213-14 (#31). Glen Howes testified that he had seen petitioner but not in public. Ex. 65, pp. 41-42 (#31). The prosecutor did not ask these witnesses if they had gone to the jail or called petitioner at the jail. Furthermore, the prosecutor had a valid reason for asking the defense witnesses whether they had seen or spoken with petitioner. These witnesses were providing petitioner with an alibi. The prosecution was within its rights to ask whether the witnesses had coordinated with petitioner about the details of the alibi. Under these circumstances, the Nevada Supreme Court reasonably applied Darden and Donnelly. Reasonable jurists might find this conclusion to be debatable or wrong, and the court will issue a certificate of appealability for ground 3(a).

In ground 3(b), petitioner claims that the prosecution improperly elicited testimony that petitioner invoked his right to remain silent and his right to an attorney. When detectives learned of petitioner's possible involvement in McConaha's death, they went to speak with petitioner at one of his parents' two homes. Petitioner, who was represented by counsel in an unrelated criminal case, said that he did not want to incriminate himself, handed over his counsel's business card, and walked away from the detectives. The detectives then left. The prosecutor mentioned the incident in his opening statement. See Ex. 57, p. 13 (#27). However, Detective John Mikolainis only testified that petitioner walked to his bedroom when asked if he would speak about McConaha. Detective Mikolainis did not testify about petitioner's statement and handing over of the business card. Ex. 60, pp. 129-31 (#29). Later in the trial, the prosecutor explained that he decided not to inquire into the details to avoid an issue on appeal should petitioner be convicted. Ex. 65, pp. 136-37 (#31).

It appears that petitioner did not present ground 3(b) to the Nevada Supreme Court.[5] Nonetheless, the court can deny the claim on its merits. 28 U.S.C. § 2254(b)(2). On this very issue, the court of appeals has held:

---

[5]Petitioner did present the ground to the state district court. See Ex. 121, p. 43 (#35).

> In <u>United States v. Giese</u>, 597 F.2d 1170 (9th Cir. 1979), in response to the defendant's argument that the use of his pre-arrest silence violated his privilege against self-incrimination, we held that "[n]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment, in the face of accusations of criminal behavior." <u>Id.</u> at 1197.

<u>United States v. Oplinger</u>, 150 F.3d 1061, 1066-67 (9th Cir. 1998). At the time that the detectives tried to speak with petitioner, he was not in custody. He also was not charged with any crimes related to McConaha's death.[6] <u>Oplinger</u> is the controlling authority, and ground 3(b) is without merit.[7] Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 3(b).

Ground 4 contains five remaining claims of ineffective assistance of trial counsel—ground 4(f) has been dismissed as unexhausted—and a claim of cumulative error of ineffective assistance of trial counsel. A petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694. "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Id.</u> at 697.

In ground 4(a), petitioner claims that trial counsel was ineffective because he did not challenge the physical evidence and did not move to preclude its use at trial. The pieces of evidence in question were the black backpack, the black apron, and the strands of hair found at petitioner's house. The Nevada Supreme Court summarized the argument and held:

---

[6] At the time, petitioner had been charged with other unrelated crimes, but his right to counsel guaranteed by the Sixth Amendment was offense-specific and had no bearing on questions about McConaha's death. See <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991).

[7] The court declines petitioner's invitation to disregard the Ninth Circuit's opinion and to follow other circuits' opinions that are more favorable to him.

> Fourth, Walker argues that trial counsel was ineffective for failing to investigate a backpack, apron, receipt, and several hairs found at Walker's residence, and for failing to preclude the use of this evidence at trial. During trial, the State argued that the backpack and apron belonged to the victim. Walker argues that this was crucial evidence and that further investigation by trial counsel would have revealed that the backpack belonged to him, that the apron belonged to a friend, and that the hairs were not the victim's but were animal hairs. Appellant fails to demonstrate that trial counsel's performance was deficient. Walker presented no evidence conclusively establishing ownership of the backpack or apron. The receipt was a cash receipt with no identifiers. DNA analysis of the three hairs revealed that two of them were animal hairs and the third was a human hair that was too damaged for further analysis. Moreover, trial counsel testified that he made a strategic decision to argue that there was nothing unusual about the victim's belongings at Walker's house because they had a friendly relationship. The district court found that the backpack and apron were not pivotal evidence and that there was a tactical decision to use the evidence in this manner. Because Walker fails to demonstrate any extraordinary circumstances regarding this decision, we agree, and conclude that the district court did not err in denying this claim.

Ex. 140, pp. 4-5 (#37) (footnote omitted). The state-court determination that the backpack, apron, and hair were not pivotal evidence is reasonable in light of the evidence presented at trial. Those items would show, at most, that McConaha went to petitioner's house some time before she went to the party at the house of Eichar and Roche. As counsel noted in the state evidentiary hearing, nobody knew whether McConaha left the backpack there ten minutes or ten months before she was killed. Ex. 122, p. 15 (#36). However, that is the end of their evidentiary value, because Eichar testified that McConaha arrived at the party along with petitioner and Johnny Walker, and both Eichar and Roche testified that McConaha left the party along with petitioner and Johnny Walker. Furthermore, an argument that McConaha stopped by petitioner's house after work to change clothes and to leave the apron and backpack was not inconsistent with petitioner's alibi defense, because these items show, at most, what McConaha might have done before 9:30 p.m. Petitioner's defense was that he was elsewhere between around 10:00 p.m. and 12:00 midnight. On the other hand, petitioner's desire to prove that he owned the backpack had its risks. The Nevada Supreme Court noted that the receipt showed a cash payment with no identifiers. The only way that petitioner could have established that he owned the backpack was to testify himself, and a year earlier petitioner had been convicted of the attempted murder of David Dimas with the use of a deadly weapon. No reasonable counsel would want a client in that position to testify simply to discredit a piece of tangential evidence. The determination that counsel made a strategic decision to downplay the backpack and apron was a reasonable application of Strickland. Reasonable jurists would not

1  find this conclusion to be debatable or wrong, and the court will not issue a certificate of
2  appealability for ground 4(a).
3       Ground 4(b) is a claim that counsel failed to obtain evidence and corroborating witnesses in
4  support of petitioner's alibi that he was at the Gameworks arcade before midnight on the night of
5  McConaha's death. Jennifer Benedict testified that she saw petitioner and Johnny Walker at
6  Gameworks between 11:45 p.m. and 12:00 midnight. Ex. 66, pp. 78-79 (#31). Petitioner argues
7  that two friends and an employee at Gameworks would have testified similarly, thus corroborating
8  Benedict's testimony. Petitioner alleges that he used a Gameworks card, and that the surveillance
9  cameras would have shown that he was at Gameworks, but neither his first counsel, John Fadgen,
10 now deceased, nor his second counsel, Anthony Sgro, tried to obtain that evidence until after
11 Gameworks had disposed of it. On this issue, the Nevada Supreme Court held:

> Fifth, Walker argues that trial counsel was ineffective for failing to obtain alibi evidence and interview corroborating witnesses. Specifically, Walker contends that trial counsel failed to obtain recorded information about the use of his MGM Gameworks game card, failing to obtain video surveillance footage from Gameworks, and failing to investigate several witnesses who had seen him at Gameworks on the night of the murder. Walker fails to demonstrate that counsel's performance was deficient or that he was prejudiced. First, the district court found that the game card could not necessarily establish an alibi because anyone who possessed the card could have used it. Further, neither the information nor the surveillance footage was still available when trial counsel started the case. Therefore, failure to obtain this evidence did not render counsel's performance deficient. Second, six or seven alibi witnesses, the "best of the lot," were presented at trial. Therefore, the alibi witnesses named by Walker would have been cumulative, and he has failed to demonstrate that trial counsel's decision not to call these particular witnesses was prejudicial to the defense. Walker fails to demonstrate any extraordinary circumstances permitting a challenge of trial counsel's tactical decision. Therefore, the district court did not err in denying this claim.

20 Ex. 140, pp. 5-6 (#37) (footnote omitted). At the evidentiary hearing, Sgro testified that he spoke
21 with people who said that they had seen petitioner at Gameworks, but that some of the people did
22 not give him the times that he needed for his alibi theory to work. Ex. 122, p. 32 (#36). Sgro also
23 testified that by the time he started to represent petitioner, the other evidence that petitioner was at
24 Gameworks was already gone. Id., p. 34 (#36). Sgro testified about the Gameworks card:

> They gave me a real short time frame. They told me that they would had to have it within 24 hours or a week. It was a very, very short window of opportunity that they say exists for them to be able to go back and print out the times that the card was used.
> They could tell you how much credit is on there, but in terms of the time it was swiped through a video game, I remember a very short window of opportunity.

Ex. 122, pp. 67-68 (#36). A week would not have been enough time even for Fadgen to get the information about the card, because petitioner was not charged with the crime until November 20, 1997, around a month and a half after October 3, 1997. Petitioner did not present any evidence about how long Gameworks kept videotapes from the surveillance cameras, but Sgro became petitioner's attorney a year and a half after October 3, 1997. The videotapes would have been long gone before Sgro even had the opportunity to seek them. The Nevada Supreme Court reasonably applied Strickland. 28 U.S.C. § 2254(d)(1). Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 4(b).

In ground 4(c), petitioner claims that counsel failed to obtain an expert witness who could testify about the influence of alcohol and narcotics upon the State's witnesses. The Nevada Supreme Court summarized the claim and held:

> Sixth, Walker argues that trial counsel was ineffective for failing to obtain a general expert witness to testify to the effects of alcohol and drugs on the human body. Trial counsel submitted a jury instruction stating that "the testimony of a drug or alcohol abuser mut be examined and weighed by the jury with greater care than the testimony of a witness who does not use drugs or alcohol." The district court rejected the instruction. Walker argues that the district court did so "because there was no testimony at trial from an expert to explain the effects of drugs upon an individual." Walker fails to demonstrate that trial counsel's performance was deficient or that he was prejudiced.
>
> Our review of the record indicates that the district court's decision not to give the proposed instruction was based on the district court's conclusion that (1) it was not proper to instruct the jury how to view or evaluate testimony, (2) consideration of how drug or alcohol abuse might affect the credibility of a witness was a matter of common sense, and (3) almost every witness appearing at trial admitted using drugs and thus the distinction offered by the instruction was unnecessary. Accordingly, the district court's rejection of the instruction was not the result of the failure to call an expert witness and Walker fails to demonstrate that trial counsel's performance was deficient. In addition, Walker does not specifically identify any particular expert nor present any potential testimony. Lastly, practically all of the witnesses at trial admitted to drug use, and thus even if trial counsel had offered the proposed expert testimony it would have reflected equally on the credibility of defense witnesses as well as those for the State. We note that the jury was instructed to weigh the credibility of the witnesses based on their testimony and demeanor. Accordingly, Walker fails to show that he was prejudiced, and the district court did not err in denying this claim.

Ex. 140, pp. 6-8 (#37) (footnotes omitted). At the evidentiary hearing, Sgro told petitioner:

> You characterize Tasha Orrillo as a star witness. I believe you would be hard-pressed to pick one person from this trial and call them a star witness. People came in here drunk. People came in here stoned, under the influence of cocaine.
>
> I remember the Judge told one male witness to speak English when he testified, because he was slurring his words and using slang. So I don't think any person was a star witness, except for the one guy who showed up in a military uniform [Tobin Roche].

-13-

> And when I talked to him he was very different, the guy from the party. He came across credible. Aside from him, I would very much disagree that any of those kids that were called were stars.

Ex. 122, pp. 41-42 (#36). As the Nevada Supreme Court noted, many of those witnesses testified in support of petitioner's alibi. If counsel did as petitioner asked, then counsel would have been discrediting his own witnesses. Furthermore, by the time the jury retired to deliberate they had learned themselves how substance abuse affects the testimony of a witness. The Nevada Supreme Court reasonably applied Strickland. 28 U.S.C. § 2254(d)(1). Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 4(c).

In ground 4(d), petitioner claims that counsel failed to object to the prosecutor asking questions that exceeded the scope of the trial court's order regarding prior-bad-act evidence. Petitioner also claims that counsel failed to propose a limiting instruction regarding the admission of evidence of petitioner's prior bad acts. The prosecution sought to admit evidence of petitioner's prior bad acts. Ex. 9 (#24). The trial court granted the motion in part, ruling in relevant part that evidence of petitioner's acts of graffiti and the shooting of David Dimas were admissible. Ex. 16 (#25). At trial, prosecution witness Tawsha Orillo[8] testified that she tried to threaten a witness to the shooting of Dimas not to go to court, but that she was unable to speak with the witness. Ex. 62, pp. 74-75 (#30). Also at trial, prosecution witness Detective Carey White testified that petitioner needed to be handcuffed while his house was searched for evidence of his graffiti activities. On this issue, the Nevada Supreme Court held:

> Tenth, Walker argues that trial counsel was ineffective for failing to object to prosecutorial misconduct and failing to propose a limiting instruction regarding the admission of evidence of prior bad acts. Walker fails to demonstrate that trial counsel's performance was deficient. The prosecutor's alleged misconduct was the elicitation of Walker's prior attempted murder of David Dimas and Walker's acts of graffiti. However, the district court admitted evidence of these crimes after a proper Petrocelli hearing, and Walker failed to demonstrate that the prosecutor introduced evidence outside the scope of the district court's ruling. Further, the jury received a limiting instruction regarding Walker's prior bad acts. Therefore, the district court did not err in denying this claim.

---

[8] This is how she spelled her own name. Court reporters and authors of briefs have spelled her name differently.

-14-

Ex. 140, p. 10 (#37) (footnotes omitted) (citing Petrocelli v. State, 692 P.2d 503 (Nev. 1985)). In granting the motion to admit evidence of prior bad acts, the trial court did not limit the circumstances of those acts into which the prosecution could inquire. See Ex. 16, pp. 65-66 (graffiti), 68-74 (shooting) (#25). The Nevada Supreme Court could, in a reasonable interpretation of Strickland, determine that a lack of objection to questions that were related to admissible evidence was not ineffective assistance of counsel. 28 U.S.C. § 2254(d)(1).

The Nevada Supreme Court also reasonably applied Strickland when it determined that counsel did not need to request a limiting instruction. The trial court gave that instruction. Ex. 69, Instr. 24 (#32). Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 4(d).

Ground 4(e) is a claim that counsel failed to impeach two witnesses for the prosecution with inconsistent statements that they had given before the trial. Dana Eichar testified that petitioner returned to her house around 12:30 a.m., and Detective Mikolainis' report of her statement indicates that she said that petitioner returned to the house around 11:10 p.m. to 11:30 p.m. Sarah Hendricks testified that she saw three young people on a sidewalk, including a female who was wearing a shirt with horizontal stripes, and Detective Mikolainis' report of her statement only mentioned several juveniles in the middle of the street.

This disposition of this ground in state court is unusual. Petitioner briefed the ground in his state habeas corpus appeal. Ex. 134, pp. 136-37 (#37). The Nevada Supreme Court held, "This claim was not raised in the district court and is not properly raised for the first time on appeal." Ex. 140, p. 11 (#37) (footnote omitted). Respondents argue that ground 4(e) is procedurally defaulted because of the Nevada Supreme Court's disposition of the issue. Petitioner counters that respondents have waived the defense of procedural default because they did not raise it in their motion to dismiss (#43). These arguments are irrelevant because, despite what the Nevada Supreme Court held, petitioner actually did raise the claim in the memorandum supporting his state habeas corpus petition. See Ex. 92, p. 10 (#33). He raised the issue again in his amended supplement to the petition. See Ex. 121, pp. 36-38 (#35). The issue was not addressed in the state-court

1  evidentiary hearing or order denying the petition.[9]  Nonetheless, petitioner did present the issue to
2  the state courts at all levels, and this court concludes that ground 4(e) is not procedurally defaulted.
3     There is no merit to petitioner's contentions with respect Dana Eichar.  Detective
4  Mikolainis' report of Dana Eichar's statement does indicate that she said that petitioner returned to
5  her house between 11:10 p.m. and 11:30 p.m.  Ex. 92, p. 61 (#33) (page number generated by
6  electronic docketing).  However, Detective Mikolainis' later declaration in support of an arrest
7  warrant indicates that Eichar said that petitioner returned to her house between 12:30 a.m. and 1:00
8  a.m.  Respondents' Ex. A, p. 18 (#58) (page number generated by electronic docketing).  These
9  documents are Detective Mikolainis' summaries of Eichar's statement, and they do not contain a
10 transcript of Eichar's verbal statement or a copy of her written statement.  Eichar's testimony in the
11 preliminary hearing was consistent with the later declaration.  See Ex. 4, p. 87 (#23).  Eichar's
12 testimony at trial was consistent with this declaration.  See Ex. 59, p. 67 (#28).  Whatever the reason
13 for the difference between the report and the declaration, Eichar's transcribed statements are
14 consistent regarding when petitioner returned to her house.  The lack of cross-examination on this
15 issue was not deficient performance by counsel.
16    The court agrees with respondents' argument regarding the differences between Detective
17 Mikolainis' report of Sarah Hendricks' statement and her testimony at trial.  Again, the document in
18 question is the detective's declaration in support of an arrest warrant, and it only summarizes
19 Hendricks' statement.  See Respondents' Ex. A, p. 14 (#58) (page number generated by electronic
20 docketing).[10]  Even if Detective Mikolainis' declaration is an accurate recitation of Hendricks'
21 statement, the differences between the declaration and her testimony are not of any importance.
22 Counsel did cross-examine Hendricks on the distance between her and the juveniles, the lighting on
23 the street, that she saw no faces, her assumptions as to which persons were male or female, whether

---

[9]Petitioner's post-conviction attorney might have intended to address the issue in the evidentiary hearing, but petitioner fired him partway through the hearing and proceeded pro se.  Ex. 120, pp. 37-45 (#35).  The issue might have fallen through the cracks in the continuation of the hearing.  See Ex. 122 (#36).

[10]The declaration refers to Hendricks as Farah Edmunson.

she had consumed any alcohol, and her weariness. Ex. 59, pp. 143-49 (#28). Those were important questions, because her answers gave the jury a better understanding of how limited her perception was. The lack of a few questions over possible minor inconsistencies was not deficient performance on counsel's part. Ground 4(e) is without merit. Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for ground 4(e).

Ground 4(g) is a claim of cumulative error for ineffective assistance of counsel, and ground 8 is a claim of cumulative error in general. The only error in the case was the jury's inadvertent viewing of evidence of petitioner's other possible crimes, and the court found that the error was harmless. Consequently, the cumulative-error claims are without merit. Reasonable jurists would not find this conclusion to be debatable or wrong, and the court will not issue a certificate of appealability for grounds 4(g) and 8.

IT IS THEREFORE ORDERED that the first amended petition for writ of habeas corpus (#22) is **DENIED**. The clerk of the court shall enter judgment accordingly.

IT IS FURTHER ORDERED that a certificate of appealability is **GRANTED** on the following issues:

1. Whether this court is correct in its determination that the jury's inadvertent viewing of notes and evidence of petitioner's prior bad acts was harmless error; and

2. Whether the Nevada Supreme Court reasonably applied clearly established federal law in its determination that references to petitioner being in custody did not have a prejudicial impact upon the jury.

DATED: March 7, 2012.

_____
PHILIP M. PRO
United States District Judge